UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | Case No. 17-CR-10265-DJC |
| SALLY ANN JOHNSON, | ) | |
| also known as "Angelia Johnson," | ) | |
| "Angela Johnson," and | ) | |
| "Sally Reed" | ) | |
| Defendant | ) | |
| | ) | |

**Government's Sentencing Memorandum**

On October 5, 2017, Sally Ann Johnson pleaded guilty to an Information charging her with attempting to interfere with the administration of the internal revenue laws over a span of roughly six-and-a-half years, from December 2007 until at least April 2014. *See* Dkt. 1 at 3. During that period, in exchange for what she claimed were psychic cleansing services, Johnson was paid over $3.5 million by a wealthy, elderly woman who suffered from dementia. Johnson directed the woman to wire the payments to a variety of accounts, including accounts in another person's name. She withdrew large portions of the payments in cash to conceal the source of the money, she used an alias when dealing with her victim, and she took other steps to conceal the extent of her income. Among them, Johnson had her victim draft a letter intended to assist Johnson in arguing to police that the payments had all been gifts. In the end, Johnson paid no income taxes on any of the payments, resulting in a loss to the fisc of approximately $725,912.

Johnson's violations of the tax laws were not occasional or opportunistic, but flagrant. To the extent she had any regard for the requirement that she pay income tax, it was only to take steps to make assessment and collection of the tax more difficult. Because of the seriousness of

her crime, its duration, its effect, and the source of the income she was concealing—proceeds of

an exploitative and fraudulent relationship with an elderly woman of diminished capacity—the

government recommends the maximum statutory sentence, three years' imprisonment, together

with restitution of $4,293,212, split between two recipients ($725,912 to be paid to the U.S.

Treasury and $3,567,300 to be paid to Jane Doe). The government also recommends a fine

within the Guidelines Range, as calculated by the government, and supervised release of

12 months.

### The Guidelines Calculation

Johnson's total offense level should be 19, calculated as follows:

| Base offense level: | 20 – U.S.S.G. §§ 2T1.1(a)(1); 2T4.1(H); *accord* PSR ¶ 37 |
| | +2 – U.S.S.G. § 2T1.1(b)(1) (failing to report income from criminal activity)[1] |
| | -3 – U.S.S.G. § 3E1.1(a)–(b) (acceptance of responsibility) |
| Total offense level: | 19 |

With a Criminal History Category of I, *see* PSR ¶ 51, Johnson's Guidelines Sentencing Range is

30–36 months.[2]

Johnson disputes the first two elements of her offense level calculation, so the

government addresses each here.

---

[1] In her objections to the PSR, Johnson erroneously accuses the government of taking a position inconsistent with the plea agreement by advocating for this upward adjustment. *See* Dkt. 16, Obj. 8. This adjustment was a subject of discussion during plea negotiations, and the plea agreement specifically contemplates the government seeking the adjustment. *See* Plea Agreement (Dkt. 9) ¶ 3 ("The U.S. Attorney will take the position that . . . in accordance with U.S.S.G. §2T1.1(b)(1), Defendant's offense level is increased by two because Defendant failed to report the source of income exceeding $10,000 in any year from criminal activity.").

[2] Johnsons' GSR would have been 30–37 months had it not been capped by the statutory maximum penalty of three years. *See* 26 U.S.C. § 7212.

I.      The tax loss exceeds $550,00, so the Base Offense Level is 20

The government agrees with Probation that Johnson's Base Offense Level is 20 because the tax loss is $725,912, which falls between $550,000 and $1.5 million. *See* PSR ¶¶ 28 and n.2, 37. The money Johnson made from Jane Doe was income—money given in exchange for a service.

Johnson is a professional psychic. As she herself reported to Probation, "[f]or decades, the defendant has been earning a living as a spiritual therapist and consultant." PSR ¶ 87.[3] "Her income," she admits," depends on the services rendered." PSR ¶ 88. She charges money for her work, and she spends money on commercial advertising. PSR ¶¶ 88–89, 15. She has owned and operated a small collection of businesses, each of which charged its clients money for purported psychic or spiritual services. PSR ¶¶ 6, 87–88.

It is clear Johnson charged Jane Doe money as well—money Doe believed she was paying in order to have Johnson cleanse her of demons. When Johnson asked for between $125,000 and $175,000 in December 2012, Doe wrote in her diary: "What A[4] asked for to deal with demons was too much . . . . Apparently, I am getting very low on funds." PSR ¶ 9. A few months later, in February 2013, Doe wrote, "Don't remember timing, but Angela asked for some more money to finish clearing me—and I am very low." PSR ¶ 9. And when Doe's payments stopped, Johnson called Doe repeatedly to collect and to attempt to renew the lucrative

---

[3] These facts and most others cited in this memorandum were included without objection in the Presentence Report, so the Court may accept them as true, as contemplated by Fed. R. Crim. P. 32(i)(3)(A). *See United States v. Olivero*, 552 F.3d 34, 39 (1st Cir. 2009) ("[T]he court may accept any undisputed portion of the PSR as a finding of fact.").

[4] Doe knew Johnson as Angela Johnson, not Sally Ann Johnson, *see* PSR ¶ 7, and frequently referred to her in her diary by what Doe believed was her initial, *A*.

relationship (so many times that, in May 2014, Doe sought a harassment prevention order). *See* Ex. A ("Angela Johnson called on May 1, 2014, and said . . . that we needed to settle the money I owed her for her psychic healing."). The relationship between payments and purported services is clear: between 2007 and 2014, Doe paid Johnson over $3.5 million in exchange for what she believed was a service. She did not give the money as a gift.

But that is the position Johnson is now taking—that "[a] majority of these funds received by Ms. Johnson were intended to be gifts from the Grantor," Jane Doe. Dkt. 16, Obj. 1. As evidence, Johnson points to a one-page, handwritten letter she produced during plea negotiations, apparently signed by Doe, that ends, "Whatever I have given Sally A Johnson, I have given with a full sense of generosity. She has more than repaid me by her physical care of me." *See* Ex. B. The letter was dated November 14, 2013—the same day police interviewed Doe and Johnson, and a few days after the police had interviewed Doe alone. PSR ¶¶ 29, 31.

This explanation is entirely implausible, and as Probation points out, it is not well supported by the November 2013 letter, in any event.[5] To accept it requires the Court to believe that Doe commissioned and received supposed psychic services from Johnson—a professional psychic—and paid her over $3.5 million but did not pay her that money in exchange for the services. It requires the Court to conclude that Doe wrote the November 2013 letter knowingly and willingly, and that it accurately reflected Doe's relationship with Johnson—to dismiss the possibility that Johnson, who maintained the letter in her files and produced it during plea

---

[5] *See* PSR at 31 (Probation's response to Objs. 1 and 2) (noting that Doe "could have just been saying that she was happily paying, and grateful for, the defendant who provided her with the services that she requested"). The reference in Doe's letter to what she "[had] given" to Johnson can be interpreted as simply a reassurance that the payments were made willingly, without comment upon whether they were made in exchange for consideration.

negotiations (*see* PSR ¶ 29), manipulated Doe into signing it because the police had begun to ask questions. Against the implausibility of that scenario, Johnson offers no explanation for what changed after November 2013, transforming payments that had thus far been gifts into taxable income.[6]

The conclusion that best explains the evidence is that Doe gave Johnson money, not as a gift, but as payment for purported services. As payment, the money was income to Johnson and was taxable. Applying the 20% tax rate of U.S.S.G. § 2T1.1(c)(2)(A) puts the tax loss at $725,912. This figure should control the base offense level, setting it at 20, as Probation correctly concluded. *See* PSR ¶ 37.

II.   Johnson defrauded Doe, so U.S.S.G. § 2T1.1(b)(1) applies

Johnson's offense level should also include a two-level upward adjustment under U.S.S.G. § 2T1.1(b)(1) because she failed to report income derived from criminal activity—in this instance, a fraud on Jane Doe. Because Doe is no longer competent to testify, we are left to draw inferences from her diary entries and behavior about the instructions she received from Johnson. Those inferences support findings that Johnson employed techniques commonly used by fraudulent fortune-tellers—confidence fraudsters who prey on the vulnerable, the gullible, and the incapacitated. *See, e.g.*, Hilary George-Parkin, *When Is Fortune-Telling A Crime?*, The Atlantic, Nov. 14, 2014, *available at* https://www.theatlantic.com/business/archive/2014/11/when-is-fortunetelling-a-crime/382738/ (describing fortunetelling fraud as "a long and highly

---

[6] Johnson's proposed tax loss figure—simply "less than $250,000," resulting in a Base Offense Level of 16 (Dkt. 16, Objs. 3, 6)—is inconsistent with an argument that all payments prior to the November 2013 letter were gifts. If all the money she earned from Doe up to the date of the letter was a gift, under U.S.S.G. § 2T1.1(c)(2)(A), her tax loss could not be greater than $51,200—20% of $256,500, the income she derived between November 15, 2013 and April 2014—resulting in a Base Offense level of only 14 under U.S.S.G. § 2T4.1(E).

orchestrated con designed to sap huge sums of money from trusting victims"). The use of those techniques, Doe's diminished capacity, the amount of money Johnson took from Doe, and various other aspects of Johnson's conduct combine to justify a finding that Johnson was defrauding Doe, not providing her with legitimate services.

*First*, Johnson chose a promising mark: a woman who was wealthy, ailing, lonely, and apparently already prone to believe in the presence and influence of evil spirits. *See* Ex. C (December 2006 list of wishes, including hope for physical and emotional companionship; hope for recovered memory and improved physical health; and hope that "Dark energies will have no access to me on any level"). All of these qualities made her a high-value target for a confidence fraudster, particularly one that uses fortunetelling as her entrée. *See* Ex. D (Declaration of Robert E. Nygaard) at 4–5 (listing factors fraudulent fortunetellers use to assess a target's vulnerabilities, susceptibility to being scammed, and wealth).

*Second*, Johnson cultivated a sense of dependence in Doe, such that, as Doe's dementia advanced, she would attribute her symptoms to demonic possession, which only Johnson had the power to ameliorate. *See, e.g.*, Ex. E (March 23 and 27, 2012 diary entries: "I hope no more demons will come. Tried to call A c. 2:30 pm – both busy. She got $ and is looking to deal with all, I'm sure. . . . A said she'll come soon. . . . Can feel demons on my brain."). This technique is typical of fraudulent fortunetellers, and by using it, they can justify further demands for payment, as Johnson did with Doe. *See* Ex. D (Nygaard Decl.) at 7–8 (describing how fraudulent fortunetellers assign blame for ordinary negative occurrences on curses, darkness, or evil spirits to obtain more money from marks, and how the fortunetellers create a sense of dependency in their victims). Throughout, Johnson's focus was always on Doe's money, as numerous of Doe's

diary entries confirm. *See, e.g.*, Ex. F ("call 12:45 pm Angela – What $ available? . . . call to Angela – have 8 – send $5,000").

*Third,* Johnson used the specter of demonic possession or curses to control Doe's behavior—specifically, to prevent Doe from giving money to others, even as Johnson continued to demand money for herself. *See* PSR ¶ 26 (*e.g.* "Angela called late. Don't give gals money from 3–6 weeks. Too toxic. [Redacted] full of demonic energy right now."). This kind of use of ominous predictions is a common means of controlling a victim. *See* Ex. D (Nygaard Decl.) at 7–8); *cf* PSR ¶ 26 ("Angela called – said don't help [Redacted] or [Redacted]. The bad energy from the $ bounces back to me.").

*Fourth*, Johnson alienated Doe from her family and caregivers—people who might dissuade her from continuing her relationship with Johnson. Johnson told Doe that Doe's brother "does not have [her] best interest in mind" and seems to have encouraged her to "stay away from" her attorney as well. PSR ¶¶ 23–24. Likely at Johnson's urging, Doe tried to keep her relationship with Johnson secret; whenever Doe spoke with Johnson, she asked her caregiver to leave. PSR ¶ 25 ("Somebody's here right now."). These tactics help fraudulent psychics maintain control over their victims and avoid law enforcement scrutiny, which might result if a family member or caregiver came to understand the relationship between psychic and victim and how much the victim was paying the psychic. *See* Ex. D (Nygaard Decl.) at 8.

*Fifth*, Johnson instructed Doe to engage in quasi-religious rituals or ceremonies, some involving money, and apparently took at least some money from Doe with the promise to return it (though Johnson did not). *See* Ex. G ("Every night lay all gold coins on bed lie on them. Pick up all stones, put on altar transfer energy to coins"); PSR ¶ 25 ("I thought I was going to get some of my money back."). Both techniques are typical of fortunetelling fraud. Fortunetelling

fraudsters commonly use ceremonies involving money as a means to get victims to hand over cash willingly, either to be cleansed and ostensibly returned later, or to be disposed of, because the victim's bad energy has supposedly been transferred into it.[7] Although Doe's diary entries do not record precisely what Doe was to do with the gold coins once she had transferred her energy to them as Johnson asked, the next step is not difficult to predict: give the coins to Johnson. Based on Doe's comments about expecting to receive some of her money back (*see* PSR ¶ 25), the Court can and should find that Johnson had promised to cleanse and return Doe's money, but never returned it.

---

[7] *See, e.g.*, Ex. D (Nygaard Decl.) at 8–9; Paula McMahon, *Imprisoned S. Fla. 'psychic' who defrauded millions from clients goes after her trial lawyer in appeal*, Sun Sentinel, August 20, 2016, *available at* http://www.sun-sentinel.com/local/palm-beach/fl-rose-marks-psychic-fraud-appeal-20160820-story.html ("Customers were told that money was the root of all evil—and their troubles. They were told that [convicted fortunetelling fraudster Rose Marks] and her family needed cash and jewelry that would be returned after cleansing rituals, but the money and valuables were not returned."); Bob Norman, *Pure Fraud*, Broward Palm Beach New Times, Sept. 6, 2007, attached as Ex. H (describing how South Florida psychic Gina Marie Marks—a relative of Rose Marks, and another convicted fraudster—took money and jewelry from a victim, ostensibly "to be purified and returned," and directed the victim to give her "precious metals like gold" to hold "until the curse was lifted"); George-Parkin, *When Is Fortune-Telling A Crime?*, (describing the Sylvia Mitchell prosecution in New York: "[Prosecutors] noted each time she promised to pay back clients with money she didn't have or lied about buying expensive candles for rituals."); Kyle Swenson, *How Modern Fortunetellers Pull Off Their Scams*, Miami New Times, June 6, 2013, *available at* http://www.miaminewtimes.com/news/how-modern-fortunetellers-pull-off-their-scams-6393338 (describing one fraudster's instructions to have a victim wrap herself in a sheet on which the victim had lain precisely $741 in cash, then give the money to South Florida psychics to cleanse).

This more nuanced con replaced an older, simpler fraud called a *bujo*, which would only work once:

> A *bujo* is when a fortune-teller tells a client that his or her money is cursed and offers to lift the curse if the client will bring in the money wrapped in a special cloth which is provided by the fortune-teller. When the client brings the money to the fortune-teller, she conducts a ritual over the money and tells the client to take it home and not touch it for a certain number [of] days. When the client opens the package she finds only cut up newspapers. A switch has been made.

Anne H. Sutherland, *Roma: Modern American Gypsies* 64 (Waveland Press, 2017).

In addition to the parallels with the conduct of known fraudsters, several other pieces of evidence tend to prove that Johnson's exploitation of Doe was criminal. Johnson used a variety of names, including using the alias she used with Doe (Angela), making her more difficult for victims and law enforcement to identify, and making it harder to establish criminal history across convictions, should Johnson ever be convicted of a crime. When Johnson received payments from Doe, she withdrew large amounts in cash, *see* PSR ¶ 12, a method of concealing a payment's source that is typical of money laundering. Other times, she sent Doe's money to a man she identified to Probation as Anthony Ephraim,[8] but whose accounts were held in the name Keith Miller, one of Ephraim's several aliases. PSR ¶¶ 7, 12. In addition, the way Johnson added herself to Doe's credit card account, and the size and nature of Johnson's credit card purchases (roughly $20,000 on entertainment and jewelry alone), are both indicators that Doe was not aware of the full amount of her money Johnson had received. (Her dramatic underestimate to the police in November 2013 may have been another indication. *See* PSR ¶ 31.) And of course, Johnson paid no taxes on Doe's payments to her or on her credit card purchases from Johnson's account, a fact probative of the potential criminal derivation of the income (because paying taxes on criminal proceeds might invite government scrutiny of their source). Several of these factors may be common to Johnson's culture,[9] but when considered in conjunction with the other

---

[8] As Johnson tells it, she and Ephraim have been "in a significant relationship" since the late 1990s, and they have two children together, but they are not married. PSR ¶ 65. When describing her financial condition, Johnson claimed Ephraim's assets and liabilities, but did not report Ephraim's income. PSR ¶¶ 91–92, 94–95. Her report of their combined net worth appears to significantly understate the value of a condominium Ephraim owns. *Compare* PSR ¶ 91 (reporting value of approximately $213,680) *with* PSR ¶ 91 n.4 (reporting public estimate of $695,000); *see also* PSR ¶ 92 (reporting a mortgage balance of $325,000, which exceeds Johnson's reported value for the condominium).

[9] At her Rule 11 hearing, and again in an interview with Probation, Johnson self-identified as a Romani or gypsy, a term that is sometimes used pejoratively but sometimes still

evidence in this case, they are also indicators of fraud. The Court should conclude, by a preponderance of the evidence, that Johnson defrauded Doe and apply the two-level upward adjustment to Johnson's offense level under U.S.S.G. § 2T1.1(b)(1).

### Application of the Section 3553(a) Factors

Below, the government addresses some of the factors under 18 U.S.C. § 3553(a) that support its recommended sentence. Viewed individually or in the aggregate, these factors call for a serious sentence.

I.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and
        to Promote Respect for the Law – 18 U.S.C. § 3553(a)(1)

Johnson's crime was serious, and its effect was significant. The financial loss in tax cases is shared by every member of the tax-paying public, and the damage to the integrity of the tax

---

used in the United States without that connotation to describe different tribes or clans of people who share certain characteristics, but not necessarily the same ethnic origin. *See Roma* (*supra*, n.7) at 9 ("[T]he Romanies in the United States use the term Gypsy to describe themselves in English; for the most part they do not use Roma or Romanies."). According to Anne Sutherland, an *emeritus* professor at University of California Riverside who has served as a defense expert on Romani culture in several criminal trials with Romani defendants, American Romani (or Roma) "customarily have several names, at the very least three." *Roma* at 29. (*See id.* at 51–52, 83 for discussion of Sutherland as expert witness.) They have one Romani name, one nickname used by family and close friends, and "several 'American names'" used in interactions with non-Roma, often one American name "for each business he conducts and one for each time he has had contact with governmentality, such as social workers or police." Sutherland writes that the "Roma, organized around traditions suitable for a nomadic people, frequently borrow each other's 'American' names and Social Security numbers, viewing them as a kind of corporate property of their kin group." *Id.* at 51. "Very often in the case of arrest and conviction, the identity of the person by his or her Romani name is never revealed or discovered by law enforcement." *Id.* at 29.

As for marriage, "[t]raditionally the American Roma do not get a marriage license from the state or have a wedding in a church," *id.* at 61; *see also id.* at 10, so government records would not help establish or disprove the existence of a Romani marriage. (Nor would common-law marriage laws be likely to apply, given the residency requirements of most such laws and the itinerant nature of the Romani.) Adult Romani "have specific jobs by which they make a living. The women are fortune-tellers and work from a front room of a house where their family lives." *Id.* at 10; *cf.* PSR ¶ 62 (noting that Johnson's mother "works as a seamstress and a psychic").

system can be profound. To a great degree, American civil society—the government's ability to operate and serve its citizenry—depends on compliance with the nation's tax obligations. Notwithstanding the absolute number of IRS employees, because of the number of taxpayers and the complexity of our tax code, our tax system remains highly dependent on truthful, voluntary compliance. *See, e.g.*, *United States v. Generes*, 405 U.S. 93, 103 (1972) (acknowledging that tax system is "largely dependent on voluntary compliance"). For that reason, any criminal violation of the tax laws is particularly injurious, and one that was as extensive and financially damaging as Johnson's only more so. A lengthy sentence in this case promotes respect not just for the tax code, but for our civil society more generally.

To the extent the Court evaluates the seriousness of the offense by reference to Johnson's offense level, it is important to recall that, by entering into a pre-indictment plea agreement, Johnson avoided charges that carry heavier sentences. *See* Plea Agreement ¶ 1 (agreeing not to charge Johnson with wire fraud, which has a maximum sentence of 20 years, and tax evasion, which has a maximum penalty of five years). Had Johnson been charged with and convicted of wire fraud, her offense level would have been at least 24, assuming a three-level reduction for acceptance of responsibility.[10] With a Criminal History Category of I, her Guidelines Sentencing Range would have been 51–63 months.

---

[10] Reached as follows:
- Base Offense Level: 7 – U.S.S.G. § 2B1.1(a)(1)
- + 18 – U.S.S.G. § 2B1.1(b)(1)(J) (loss of between $3.5 and $9.5 million)
- + 2 – U.S.S.G. § 3A1.1(b)(1) (vulnerable victim)
- - 3 – U.S.S.G. § 3E1.1 (acceptance of responsibility)

II.     The Need for the Sentence Imposed to Provide Just Punishment for the Offense –
        18 U.S.C. § 3553(a)(2)(A)

Here, the defendant's high degree of culpability merits a substantial sentence. *See*

18 U.S.C. § 3553(a)(2)(A). The measures of her culpability include:

Motive/Lack of Extenuating Conditions – Johnson's motive was purely personal gain. By

all measures reported in the Presentence Report, Johnson enjoyed a comfortable lifestyle and still

does. She did not act under coercion, duress, or any extenuating outside influence. In addition,

Johnson understood that her gain represented another's loss,[11] in this case, the U.S. Treasury's.

For a financial crime, these factors point toward the highest degree of culpability.

Duration – The defendant's criminal conduct persisted for over six years. Her crime was

not the result of a momentary lapse in judgment or weakness of will. It was a manifestation of

her prolonged willingness to engage in an exploitation of Doe and the U.S. Treasury for the sake

of personal profit. The duration of Johnson's criminal undertaking is another factor

demonstrating a high degree of culpability.

III.    The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal
        Conduct – 18 U.S.C. § 3553(a)(2)(B)

General deterrence is particularly important here. Relative to the rate at which tax crimes

are committed, few tax violators are prosecuted. *See* U.S.S.G. § 2T1.1, Intro. Commentary. For

that reason, "deterring others from violating the tax laws is a primary consideration" when

determining a tax defendant's sentence. *Id.*; *see also United States v. Mueffelman*, 470 F.3d 33,

40 (1st Cir. 2006) (noting that deterrence of white-collar crime is of central concern to

---

[11] In contrast to, for instance, an investment scheme in which the defendant lies to
potential clients about her firm's track record and methodology in order to secure investments
that will earn her management fees, but actually invests the money rather than stealing it.

Congress). The societal interest in deterring tax crimes is clear, a function of the serious financial and structural damage they cause.

But specific deterrence is important here, too. Because of the defendant's lack of education and alternative career skills, *see* PSR ¶¶ 58, 67, 84–86, there is a substantial risk that she will return to fortunetelling when she completes her sentence. In that setting, the temptation and opportunity to exploit vulnerable clients and to circumvent the tax laws will again be present, perhaps particularly so if the consequences of doing so are not significant. To deter the defendant from succumbing to that temptation, a substantial sentence is warranted now.

IV.     The Need for the Sentence Imposed to Provide the Defendant With Needed
        Educational or Vocational Training – 18 U.S.C. § 3553(a)(2)(D)

In addition to its deterrent effect, a lengthy sentence could be rehabilitative, providing Johnson with the opportunity to obtain the high school equivalency degree she says she is interested in securing (notwithstanding her decision to remove her own children from the educational system). *See* PSR ¶¶ 67, 85. Under 18 U.S.C. § 3553(a)(2)(D), the need for the sentence to provide the defendant with needed educational and vocational training is another factor the Court must consider when imposing sentence. *See* 18 U.S.C. § 3553(a)(2)(D). Here, this factor weighs in favor of a lengthy period of incarceration. Johnson is a licensed psychic, but "has no other professional licenses, specialized skills, or military experience." PSR ¶ 86. With a sufficiently long sentence, she could address those deficiencies in prison, along with her poor literacy (*see* PSR ¶ 84), which, if left unaddressed, will severely impede her ability to obtain legitimate work after prison.

**Restitution**

Consistent with Paragraph 4 of the plea agreement, the parties jointly recommend a restitution order with two components:

(1)    Restitution to the IRS in an amount to be determined at sentencing for the tax loss

Johnson caused between 2007 and 2014; and

(2)    Restitution of $3,567,300 to the person described as Jane Doe in the Information.

The amount of restitution to Jane Doe is agreed. The restitution owed to the IRS is equal to the

tax loss in this case: $725,912. *See* PSR ¶ 28 and n.2. The total restitution order should therefore

be for $4,293,212.

The Court has authority to—and should—enter an ordinary restitution order, due and

owing in full immediately. *See* 18 U.S.C. § 3663(a)(3) ("The court may also order restitution in

any criminal case to the extent agreed to by the parties in a plea agreement."). Once done, the

Court can set a schedule of payments that recognizes any limitations on the defendant's ability to

pay. *See* 18 U.S.C. § 3664(f)(2)–(3). In addition, the government recommends that restitution be

made a condition of Johnson's supervised release, as contemplated by U.S.S.G. § 5E1.1(a)(2).

## Conclusion

Here, the deliberate, protracted, and damaging nature of Johnson's crime calls for a stern

sentence. For roughly six-and-a-half years, Johnson worked to impede the IRS, resulting in loss

to the federal government of approximately three quarters of a million dollars and a degradation

of the nation's voluntary tax collection system. The consequences should likewise be substantial.

To punish the defendant for her crime, to promote respect for the law, and to provide the

defendant with resources to choose another way of life after prison, the government recommends

the maximum sentence, three years, to be followed by 12 months of supervised release. The

government also recommends a fine within the Guidelines Range, as calculated by the

government (unless the Court finds that Johnson would be unable to pay it). Finally, the Court

should also enter an order of restitution for $4,293,212, to be paid as follows: $725,912 to the

U.S. Treasury and $3,567,300 to the person identified in the Information as Jane Doe.


Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:     */s/ Brian A. Pérez-Daple*
SANDRA S. BOWER
BRIAN A. PÉREZ-DAPLE
Assistant U.S. Attorneys

## Certificate of Service

I hereby certify that this document, filed through the ECF system, will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing.

Dated: January 10, 2018     */s/ Brian A. Pérez-Daple*
Assistant United States Attorney